SHIRLEY S. ABRAHAMSON, J. (dissenting).
*726 ¶ 35 Today, the majority expands the Building Permit Rule to create vested rights to particular uses of land so long as the land is "specifically identified" in the building permit application.[1]
*129 ¶ 36 This ill-advised expansion of the Building Permit Rule sacrifices the important public policies that the Building Permit Rule was designed to encourage, namely, "predictability for land owners, purchasers, developers, municipalities, and the courts."[2]
¶ 37 The majority's expansion of the Building Permit Rule transforms what was once an easy-to-apply, bright-line rule into a rule requiring a case-by-case analysis of the applicant's specificity regarding both the description of the property included within the scope of the building permit application as well as the property's proposed use.
¶ 38 Accordingly, I dissent.
I
¶ 39 In the majority of jurisdictions, a building permit can be revoked if the property is rezoned after the permit is issued even if construction has already begun.
¶ 40 In these jurisdictions, in addition to applying for and obtaining the building permit, land owners and developers must have incurred substantial expenditures or construction must already be substantially underway in order for the land owners or developers to acquire the right to construct the proposed building *727 despite the building's non-compliance with the new or amended zoning ordinance.[3]
¶ 41 In contrast, Wisconsin is among the minority of jurisdictions that recognize a vested right to construct a building when the land owner submits a building permit application that strictly conforms to all applicable zoning ordinances in effect at the time the application is submitted.[4] This doctrine is referred to as the Building Permit Rule.
¶ 42 Just last term, this court reaffirmed Wisconsin's adherence to the Building Permit Rule and explained the important policies that the rule promoted. The court stated:
Wisconsin applies the bright-line building permit rule because it creates predictability for land owners, purchasers, developers, municipalities and the courts. See, e.g., Guertin v. Harbour Assurance Co. of Bermuda, 141 Wis. 2d 622, 634-35, 415 N.W.2d 831 (1987) (explaining that bright line rules provide predictability and protect all parties). It balances a municipality's need to regulate land use with a land owner's interest in developing property under an existing zoning classification. A municipality has the flexibility to regulate land use through zoning up until the point when a developer obtains a building permit. Once a building permit has been obtained, a developer may make expenditures in reliance on a zoning classification.
McKee Family I, LLC v. City of Fitchburg, 2017 WI 34, ¶ 43, 374 Wis. 2d 487, 893 N.W.2d 12.[5]
*728 ¶ 43 Underlying the Building Permit Rule is the notion that land owners and developers are proceeding on the basis of a *130 reasonable expectation.[6] That is, submitting a building permit application that conforms to the zoning or building code requirements in effect at the time of the application gives rise to the reasonable expectation that construction can proceed and expenditures can be made in reliance on the then-applicable zoning classification.[7]
II
¶ 44 In the instant case, the majority expands the Building Permit Rule to create vested rights to particular uses of land so long as the land is "specifically identified" in the building permit application.
¶ 45 The majority's expansion of the Building Permit Rule creates uncertainty in a previously predictable process in at least two ways.
¶ 46 First, the majority announces that a particular use of land will be protected under the Building Permit Rule so long as the land is "specifically identified" in the building permit application. While acknowledging *729 that "[a] legal description is preferable," the majority says that a map may suffice as well.[8]
¶ 47 The majority explains why the map submitted with Golden Sands' building permit application is sufficiently detailed to objectively identify the relevant land.[9] Even accepting that proposition as true, the outcomes of future cases remain uncertain. At what point will a map lack sufficient detail to "specifically identify" the land at issue? Simply asking this question indicates that the majority has injected uncertainty into the application of the Building Permit Rule where it did not previously exist.
¶ 48 In my view, requiring (as opposed to preferring) a legal description of the lands included in the building permit would eliminate this uncertainty, but it would also compel a ruling against Golden Sands because Golden Sands submitted in its building permit application a legal description of only the land upon which the proposed buildings would be constructed.
¶ 49 Second, and perhaps more importantly, how specific must the building permit application be with regard to the proposed use of the land specifically identified in the application?
¶ 50 In the instant case, Golden Sands' building permit application did not include a great deal of detail about the overall proposal outside of the building site, and Golden Sands did not consult with the Town before filing its application.
*730 ¶ 51 The majority points out that the building permit application included copies of applications for various state permits required to operate the farm that described Golden Sands' proposed farming operation in greater detail. However, the majority acknowledges that "Golden Sands *131 was not required to provide copies of the state permit applications to receive a building permit from [the Town], but rather did so as a 'courtesy.' "[10]
¶ 52 This acknowledgement raises an important but unanswered question: Would Golden Sands' application be sufficient under the majority's expanded Building Permit Rule without the inclusion of the "courtesy" materials submitted to the Town?
¶ 53 If the answer to this question is "no," that would seem to contradict the majority's conclusion that the "courtesy" materials were not required in order to vest in Golden Sands the right to use the land as described in those "courtesy" materials.[11]
¶ 54 If the answer to this question is "yes," that would encourage land owners and developers to withhold from municipalities the specific details about how they intend to use the land. Creating an incentive to provide less rather than more detail in the application process frustrates the paramount policy goal advanced by the Building Permit Rule-providing predictability to all parties.
III
¶ 55 The majority has erroneously expanded the Building Permit Rule beyond its traditional scope. In doing so, it has undermined the rule's primary *731 purpose of ensuring predictability in the development process for both developers and municipalities.
¶ 56 Because the majority's expansion of the Building Permit Rule undermines the rule's fundamental purpose, I dissent.
¶ 57 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

Majority op., ¶ 4.

McKee Family I, LLC v. City of Fitchburg, 2017 WI 34, ¶ 43, 374 Wis. 2d 487, 893 N.W.2d 12.

4 Patricia E. Salkin, American Law of Zoning § 32:3, at 32-6 (5th ed. 2017).

McKee, 374 Wis. 2d 487, ¶ 37, 893 N.W.2d 12.

Although the quoted language from McKee speaks of "obtaining" a building permit, the holding of McKee is that the land owner's right to construct a proposed building vests when the land owner "has submitted an application for a building permit that conforms to the zoning or building code requirements in effect at the time of application." McKee, 374 Wis. 2d 487, ¶ 4, 893 N.W.2d 12.

McKee, 374 Wis. 2d 487, ¶ 42, 893 N.W.2d 12.

At the time Golden Sands submitted its building permit application, the land at issue was enrolled in the DNR's Managed Forest Land program, which precluded agricultural uses, and Golden Sands was aware of the Town's efforts to rezone the land.
One wonders how reasonable Golden Sands' expectations were, given what it knew at the time it submitted its building permit application.

Majority op., ¶ 4 n.5. Golden Sands is fortunate that the majority is satisfied with a map, because Golden Sands did not provide a legal description of the total acreage it intended for use for its farming operation. Instead, the only legal description provided by Golden Sands was the legal description of the land upon which the proposed buildings would be constructed.

Majority op., ¶ 31.

Majority op., ¶ 6.

See majority op., ¶ 6.